In Washington, D.C., there is a museum I've visited many times. It's called the Newseum, and it's a museum for journalists around the world. And in that museum, it lists the number of journalists, their names. And what is amazing is the large number of Filipino journalists that are mentioned there. It has one of the highest attrition rates anywhere in the world, according to the country reports, at least three journalists a year are killed and many more injured in attempts on their lives. Many of them are radio journalists and print journalists. Mr. Avenido was both a print and broadcast journalist. In 1991, he stumbled upon a story where he was the only one who saw it, the corruption of a big city mayor. And he reported it and it was broadcast. As a result of that, he has suffered tremendously in the Philippines, and he outlined that in his testimony. And he was able to come here to the United States. Now, one of the arguments that the government and the Board of Immigration Appeals raises is that he does not have a defined statutory ground. When journalists, let's say Kathy Kirk or Brian Williams, they're not asked what their political opinion. They report what they see as corruption or what they see as wrongdoing. And that in itself, we contend, is a political opinion when you're opposed to corruption, when you dare to expose corruption. Now, Mr. Avenido, his best friend, the one who was providing him with a lot of support and who was known as his close friend, was killed. And he feels very guilty that it was his friendship with him that caused him to be killed. He has, yes, the mayor. Mr. Rodas, you know we're going to have to decide the case on what is on the record. Yes. But that is also on the record. He did that. Oh, it's the record that his friend was killed. We don't know why. We don't know if it was because of his friendship with your client. Do we, on this record? No, but we believe that the circumstances – And I'm not suggesting you can't believe it. That's right. But on this record, do we know that that's the cause? Yes, Your Honor. That – You can tell me yes and no. No. I mean, but that caused – I mean, the subjective fear of persecution, his fear that because of his close friendship, this friend was killed. And he had outlined also, he testified about the attempt on his own life that caused him to fear, you know, that he would suffer persecution as a result of exposing it. If any of the three Filipino journalists who are killed every year managed to have escaped the Philippines before they were killed and would be testifying and asking for political asylum, I doubt if they too would be able to show political – whether they were killed or the attempt was based on their political opinion. Their job as journalists is to expose corruption, to be able to show wrongdoing. That's the purpose of the Fourth Estate of the free press in any democratic country. And therefore, he did what his – what he was tasked to do as a member, as a journalist. And the requirements of having to show whether he had a political opinion, I think that's implicit, that his opinion was that there should be no corruption and that when you fight corruption, when you expose corruption, that in itself is a – it should be and is a protected ground. Couldn't he get copies? Does he have family? He has – they're afraid. I'm not sure why he wasn't able to get it. According – you know, it was difficult. Some of the ones he had had been lost because of his hurry in leaving the country. He didn't – there was no adverse credibility finding here. That's correct. But he – but the BIA seemed to think that he at least overstated things in his direct examination. When – And that he testified truthfully on cross, but that it undermined the validity of what he had said originally when he said he had destroyed a career, the fellow was reelected afterwards, and that he couldn't – did he ever explain why he couldn't get copies of the newspaper articles? A lot of the newspaper articles, he provided the information. A lot of the broadcast, he provided the information. He was the reporter who got the information, fed it to the others. Now, he may have overstated his – when he said that he destroyed – obviously, the man he sought to expose went on to be reelected, and after he left, he was able to become senator. And although this is not in the findings, he's planning to run for president, but the only person who could expose and who did expose the corruption of this individual was Mr. Avenito. And he's the one person who had that, and therefore, getting rid of him was something that certainly was what we can understand the mayor wanted to do. And certainly, it contributed to his subjective fear that because of what he did – and he stumbled on it. He just happened to be covering it one day, and then he saw what he saw. And that has caused him immeasurable difficulty since then. Well, he testified – at the hearing, it says he testified that Mayor Gordon hired someone to kill him because the mayor had a personal vendetta against the respondent. What – what showing is there that he – that he was actually persecuted on account of his political opinion other than his being jailed? The attempt on his life that he described when he was in a taxi and he was – and that happened. The killing of his friend. But we don't know why those things happened. I understand. And that would be the same problem. A lot of things when you're in there, you may not from a lot of the objective standpoint, but we can understand when all of this happens, and it happens right after he exposed, and he was the only journalist to do so, and this man was a very powerful man, and then a series of events happens. And of course, if you isolate those events, you can say, what's the connection? Where's the evidence? But if we look at them in the totality of what was happening then, we can reach certain conclusion. We can. We can. But is it compelled that we do so? That's our problem. I believe, you know, in terms of protecting the rights of journalists in order to assure that we are able to have a free press and alive and breathing journalists to provide that free press, that we – you know, that we understand how – how the realities of politics actually works. Thank you. May it please the Court, my name is Joanne Johnson, and I represent the United States in the case before the Court today. The instant petition for review should be denied because the record evidence does not compel a conclusion contrary to the agency's denial of the petitioner's application for asylum and withholding of removal. To prove a case for asylum, as the immigration judge had indicated in his opinion, the alien must provide specific detailed and credible testimony or a combination of detailed testimony and corroborative evidence. Here, petitioner did not meet his burden of proof of establishing eligibility for asylum or withholding of removal. The DIA said he introduced 40 documents. What were those documents? He introduced 40 documents. Some of those documents were photographs that he had taken. Some of those documents were from when he came into the United States and were documents from political officials in the United States. The documents from the Philippines included some letters from friends in the Philippines and a relative, as well as a document from his media organization indicating that he was employed there. There was a photograph of him with the mayor that he alleges he exposed, and that's a summary of it. I could go through more of those if Your Honor has more questions about the specifics. Well, what is it that is really in question here? Is it that he was a reporter? That isn't really in question, is it? No, Your Honor. It's the problems between petitioner's testimony on direct and what was revealed on cross, which undermines the validity of his application for asylum and withholding of removal. It wasn't persuasive evidence to show that he met his burden of proof. For example, with respect to his journalism, he had indicated that he'd written several articles that he had written, nor had he produced any articles that indicated that he was instrumental in exposing this alleged corruption of the mayor. I'm sorry. I don't have the transcript here. Was he asked why he didn't have copies of the articles? When he was asked why he did not have copies of the articles, he had indicated that he had moved to different parts of the Philippines and had lost track of the articles. However, it's been several years since he's come to the United States, or prior to even the hearing in the United States, and he did not produce any of these alleged articles that he'd written or any articles describing the corruption that he allegedly exposed, which is the mayor Gordon's alleged corruption. But does the record indicate that he worked for some entity that was a responsible national entity so that these articles would be available and easily procurable? The record evidence shows that he did work for a media organization called P-A-C-A-G, I believe, and he, as far as whether that organization was so large that it would be that he would be able to obtain those articles, that was not presented. However, during his testimony, he did indicate that his story was picked up by the AP press, and there was no evidence of that produced in the record, which is big media outlet. We have – I believe we have law that where the BIA is relying on discrepancies in order to discredit testimony that the Petitioner puts forward, that the Petitioner has to have an adequate opportunity to explain those. Is the record clear here that he did have an opportunity to explain these discrepancies that seemed to have been fatal? Yes, Your Honor. As I indicated with respect to why these articles, this corroborating evidence wasn't provided, he explained that it was because he had relocated to different So he didn't provide any reasonable explanation for these discrepancies in the record, which further undermined the validity of his claim. In addition – Well, this was at a time – this was when? Back in the mid-90s? This was in the early 90s. So this wouldn't be on computers or in the database, necessarily? There was not a question asked about computers, but I – so I don't know specifically the answer to that question. In addition, Petitioner revealed on cross-examination that a broadcaster of a radio station revealed this alleged corruption that Petitioner had exposed. There's nothing in the record, however, indicating anything that happened to that broadcaster who exposed that corruption. In addition, the mayor, whose career was allegedly destroyed as a result of Petitioner's exposure of this corruption, was re-elected several times as Petitioner conceded during cross-examination, which further undermines the validity of his claim that he should warrant asylum. Next, with respect to the death of his friend, there's no evidence in the record indicating that the death of his friend, Mr. Hernandez, was a result of Petitioner's exposure of the alleged corruption of the mayor in the Philippines. In addition, Petitioner, after he supposedly went into hiding, he then later worked for a congressman in the Philippines, and he never raised – or if he raised his fears to the congressman, nothing was done about that, except then he left and came to the United States. Importantly, his family continues to reside unharmed in the Philippines, which also further undermines the validity of his fear of persecution. On the basis of all of these points, the immigration judge in board's determination that Petitioner failed to meet his burden of proof for asylum and withholding of removal was correct. The evidence does not compel a contrary conclusion. And if your honors do not have any additional questions for these reasons, the government respectfully requests that the court deny the petition for review. Thank you. I neglected to say at the opening that Judge Rawlinson is here with us by video because of a family emergency. Judge Rawlinson, do you have any questions? No, thank you. Good morning. Good morning. I apologize for not introducing you earlier. No problem. Thank you, your honors. I think the fact that his family has not suffered persecution, I think there are a number of cases that we cited that that itself is not indicative. They did not do anything to merit. It was what Mr. Avenido did that caused him to be worried. And as long as he was away from them, they were safe. His worry, of course, is that if he was there with them, then they might be caught as far as ---- That's all very understandable, but what I don't understand is if this was ---- these articles were so open and notorious that they caused great suffering to a very, apparently very powerful figure who will cause persecution in the future and cause persecution in the past, if all that is true, and the family is still there, why weren't copies of any of these articles that would show the nature of ---- would document the risk, why weren't they available? Couldn't the family ---- does the record explain why the family couldn't go to the records and get copies? No, the record did not explain that. I believe that he may have overstated the effect. Obviously, he did. I mean, in his mind, he was exposing something, and if he had realized what effect it would have on his life and his family's life, he probably may not have done it. But he might have also, as his responsibility as a journalist, but that's what we have. Did he have counsel at his hearing? What's that? Did he have counsel at his hearing? Did he? Did he, yes. Did he have counsel at his hearing? Yes, he did. It was not me. It was someone else, yes. Thank you. Thank you. The case just argued is submitted for decision. The next case, Nanos v. Gonzalez, is submitted on the briefs. It is so ordered.
judges: Schroeder, Farris, Rawlinson